**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| BRIAN SHRIMPTON | ) | CASE NO:  1:10-cv-00513 |
| *Individually and for and on behalf* | ) | |
| *of spouse, Patricia Shrimpton*, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | NANCY A. VECCHIARELLI |
| QUEST DIAGNOSTICS | ) | |
| INCORPORATED *et al.* | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendants. | ) | Doc. Nos. 24, 25 |


    This case is before the undersigned United States Magistrate Judge pursuant to

referral for general pretrial supervision, including filing with the Court a report containing

proposed findings and a recommendation for disposition of case-dispositive motions.

(Doc. No. 8.)  Plaintiffs, Brian and Patricia Shrimpton, and Defendant, Quest

Diagnostics Incorporated ("Quest"), have filed cross-motions for summary judgment

(Doc. Nos. 24, 25), respective briefs in opposition (Doc. Nos. 26, 27), and respective

reply briefs (Doc. Nos. 27, 28).  For the reasons set forth below, the Magistrate Judge

recommends that Quest's Motion for Summary Judgement be DENIED and Plaintiffs'

Motion for Summary Judgment be DENIED.

## I.    BACKGROUND

### A.    Complaint

On March 3, 2010, Brian Shrimpton ("Brian") filed a complaint for and on behalf of himself and his wife, Patricia Shrimpton ("Patricia"), alleging that Quest violated the Family Medical Leave Act ("FMLA") by failing to respond to Brian's request for FMLA leave while he was an employee with Quest; and that Quest and Aetna, Inc. ("Aetna"), violated the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161 *et seq.* (which amended the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.*) by failing to notify Patricia in a timely manner that she could continue her health benefits under Quest's group health plan after Brian was terminated from employment.

On June 28, 2010, Brian and Patricia (collectively "Plaintiffs") reached a settlement agreement with Aetna.  (Doc. No. 16.)  On July 12, 2010, the Court ordered Aetna to be dismissed from this litigation with prejudice pursuant to the settlement agreement.  (Doc. No. 17.)

On July 15, 2010, Brian filed an amended complaint for and on behalf of himself and Patricia.  Brian's FMLA count was not included in the Amended Complaint.  The sole, remaining count in the Amended Complaint alleges only that Quest violated COBRA by failing to notify Patricia in a timely manner that she could continue her health benefits under Quest's group health plan after Brian was terminated from employment. (Doc. No. 18.)

### B.    Factual Background

The following material facts are not in dispute unless otherwise indicated.  Brian Shrimpton worked for Quest since 1979.[1]  He was involuntarily terminated from employment with Quest on August 1, 2009.  Quest alleges that Brian was terminated because Quest learned that Brian was indicted for, and pleaded guilty to, two counts of pandering sexual material involving a minor, a second-degree felony under Ohio law, and one count of possession of criminal tools, a fifth-degree felony under Ohio law; and that Brian was expected to be sentenced to prison for two to five years.  Quest provides a journal entry from the Cuyahoga County Court of Common Pleas that indicates that Brian pleaded guilty to these crimes, was categorized as a Tier II Sex Offender, and was sentenced to prison for five years.  (Cuyahoga County Ct. Common Pleas, Journal Entry Aug. 7, 2009, No. CR-08-516751-A.)  Plaintiffs do not refute this evidence.

While employed with Quest, Brian enjoyed health benefits under Quest's group health plan.  At the time Brian was terminated, Patricia also enjoyed health benefits provide by Quest as Brian's beneficiary.  Quest was the administrator of Brian's and Patricia's health benefits plans.

Plaintiffs allege that, upon Brian's termination on August 1, 2009, Patricia's health benefits were terminated; that Quest never notified Patricia that her benefits were terminated; that Patricia discovered that her benefits were terminated only after she

---

[1] Neither party explains in their pleadings what Brian Shrimpton's position or duties were while he was employed with Quest.  Quest alleges in its combined Brief in Opposition and Reply that Brian was a manager in Quest's National Referral Testing department.  Quest cites nothing, however, to support this allegation that Brian was a manager.

subsequently attempted to obtain prescription medications; and that, as a result of Quest's termination of benefits and untimely notice, Patricia incurred uncovered medical expenses.

On October 31, 2009, Plaintiffs' counsel sent a letter to Quest alleging that Quest had violated COBRA by failing to send Patricia notice that she could continue coverage under Quest's group health plan as Brian's beneficiary.

On November 9, 2009, Quest sent Patricia notice that she may continue coverage under Quest group health plan, as well as forms by which Patricia could elect to continue that coverage.  Quest alleges, however, that the notice and election forms were sent by mistake by Quest employees who did not understand the circumstances of Brian's termination.  Quest alleges that Brian's criminal conduct constituted "gross misconduct" under COBRA, which disqualified both Patricia from receiving notification or continuation coverage pursuant to COBRA.

Plaintiffs allege that Quest never notified Patricia that she was disqualified from receiving notification and continuation coverage because Brian was terminated for gross misconduct.  Plaintiffs further allege that, when Brian was informed that he was being terminated from employment with Quest, a Human Resources Manager for Quest told Brian that he could expect to receive COBRA paperwork.  Quest admits that it did not explain to either Brian or Patricia that it had terminated Brian for conduct that constituted "gross misconduct" as defined under COBRA until after this litigation was initiated.

On or around December 9, 2009, Patricia submitted a premium payment to

-4-

Quest by check and became covered under Quest's group health plan.[2]

### C.    Summary Judgment

On November 23, 2010, Quest filed its Motion for Summary Judgment.  (Doc. No. 24.)  Quest argues that Brian Shrimpton's misconduct constituted gross misconduct under COBRA, that Brian's gross misconduct disqualified his spouse, Patricia, from receiving COBRA notification and, therefore, that Quest was never required to send Patricia such notification.

On December 11, 2010, Plaintiffs filed their Brief in Opposition to Quest's Motion for Summary Judgment.  (Doc. No. 26.)  Plaintiffs argue that Brian's misconduct did not constitute gross misconduct under COBRA, so Patricia was not disqualified from receiving COBRA notification and Quest was obligated to send her such notice. Plaintiffs also argue that Quest waived its gross misconduct defense by acting as if Patricia had been entitled to receive COBRA notification after Brian was terminated.

Also on December 11, 2010, Plaintiffs filed their Motion for Summary Judgment. (Doc. No. 25.)  Plaintiffs argue in their Motion for Summary Judgment that Quest waived its gross misconduct defense by acting as if Plaintiff had been entitled to receive COBRA notification after Brian was terminated.

On December 22, 2010, Quest filed a combined Brief in Opposition to Plaintiffs' Motion for Summary Judgment and Reply to Plaintiffs' Brief in Opposition to Quest's

---

[2] Neither party explains whether Patricia Shrimpton remains covered under Quest's group health plan.  Moreover, neither party explains whether Brian Shrimpton was notified of a right to continue his health benefits with Quest, whether Brian had an opportunity to elect continuation coverage with Quest, whether Brian attempted to elect continuation coverage with Quest, or whether Quest denied Brian continuation coverage.

Motion for Summary Judgment.  (Doc. No. 27.)  On January 3, 2011, Plaintiffs filed their Reply to Quest's Brief in Opposition.  (Doc. No. 28.)

## II.    LAW AND ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party can meet this burden in two ways:  by presenting sufficient evidence to indicate there is no genuine issue of material fact; or by arguing that the nonmoving party, after adequate time for discovery, fails to show sufficient evidence to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial.  See Cox v. Ky. Dep't of Transp., 53 F.3d 146, 149 (6th Cir. 1995).  The trial court has no duty to search the entire case record to establish that it is bereft of a genuine issue of material fact.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989).  The nonmoving party has an affirmative duty to direct the court's attention to specific evidence upon which it seeks to rely.  Al-Qudhai'een v. Am. W. Airlines, Inc., 267 F. Supp. 2d 841, 845 (S.D. Ohio 2003) (citing In re Morris, 260 F.3d 654, 665 (6th Cir. 2001)).  The lack of such a response by the nonmoving party may result in an

automatic grant of summary judgment.  *Reeves v. Fox Television Network*, 983 F. Supp. 703, 709 (N.D. Ohio 1997).

In reviewing summary judgment motions, a court must view all facts and inferences drawn therefrom in a light most favorable to the nonmoving party.  *Pachla v. Saunders Sys., Inc.*, 899 F.2d 496, 498 (6th Cir. 1990).  However, the Court does not weigh the evidence or make credibility determinations.  *Joostberns v. United Parcel Services, Inc.*, 166 F. App'x 783, 787 (6th Cir. 2006).  Moreover, the mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 *1986).  In other words, the court should determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  *Id.* at 251.

When evaluating cross-motions for summary judgment, the court is obligated to analyze each motion on its own merits and view the facts and inferences in the light most favorable to the nonmovant.  *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

### B.   Gross Misconduct

Quest contends that it cannot be liable for failing to notify Patricia in a timely manner of a right to continue coverage because Brian was terminated for conduct that constituted gross misconduct under COBRA, which disqualified Patricia from receiving COBRA notification and continuation coverage.  Because Quest has asserted its gross misconduct defense as the basis for its Motion for Summary Judgment, the facts and

inferences relevant to whether Brian was terminated for conduct that constituted gross misconduct under COBRA will be viewed in a light most favorable to Plaintiffs.

COBRA generally requires that group health plans[3] sponsored by employers with twenty or more employees offer covered employees[4] and their families the opportunity for a temporary extension of health coverage in certain instances where coverage under the plan would otherwise end.  U.S. Dep't of Labor, http://www.dol.gov/dol/topic/health-plans/cobra.htm (last visited Jan. 24, 2011); see 29 U.S.C. § 1161(a); S. Rep. 99-146, at *362-67 (1985).  Employees and their families may become eligible for continuation coverage only upon the happening of a "qualifying event."  See 29 U.S.C. § 1163.  Upon the occurrence of a qualifying event, the group health plan administrator must notify the affected covered employees and their families that they may elect to continue coverage under the employer's group health plan.  See 29 U.S.C. § 1166(a)(4)(A); 29 U.S.C. § 1166(c).

Termination from employment may constitute a qualifying event under COBRA. 29 U.S.C. § 1163(2).  Termination for conduct that constitutes "gross misconduct" under COBRA, however, is not a qualifying event.  Id.  Therefore, if an employee is terminated for conduct that constitutes gross misconduct under COBRA, the administrator of the

---

[3] Generally, a group health plan is "an employee welfare benefit plan providing medical care (as defined in section 213(d) of Title 26) to participants or beneficiaries directly or through insurance, reimbursement, or otherwise."  29 U.S.C. § 1167(1).

[4] A "covered employee" is "an individual who is (or was) provided coverage under a group health plan by virtue of the performance of services by the individual for 1 or more persons maintaining the plan (including as an employee defined in section 401(c)(1) of Title 26).  29 U.S.C. § 1167(2).

group health plan is not required to notify the terminated employee and his family that they may elect to continue coverage under the plan. *Boudreaux v. Rice Palace, Inc.*, 491 F. Supp. 2d 625, 633 (W.D. La. 2007); *Bryant v. Food Lion Inc.*, 100 F. Supp. 2d 346, 375, 377-78 (D. S.C. 2000), *aff'd on other grounds*, 8 F. App'x 194 (4th Cir. 2001); *Nakisa v. Cont'l Airlines*, No. H-00-090, 2001 WL 1250267, at *2 (S.D. Tex. May 10, 2001); *see* 29 U.S.C. § 1163(2); 29 U.S.C. § 1166(a)(4)(A), (c); *Moore v. Williams College*, 702 F. Supp. 2d 19, 24 (D. Mass. 2010).

Here, Quest alleges that Brian Shrimpton's indictment for, and guilty plea to, two counts of pandering sexual materials involving a minor and consequent prison sentence was the basis for his termination, and that his criminal conduct and prison sentence constitute gross misconduct under COBRA. Plaintiffs do not challenge Quest's allegation that Brian was terminated for his criminal conduct. Plaintiffs contend only that employee misconduct must sufficiently relate to or affect the employee's employment to constitute gross misconduct under COBRA, and that Brian's misconduct does not constitute gross misconduct under COBRA because his misconduct was not sufficiently related to, or did not sufficiently affect, his employment with Quest. For the reasons set forth below, the Court agrees that an employee's misconduct must sufficiently relate to or affect the employee's employment to constitute gross misconduct under COBRA. Moreover, the Court finds that, although Brian Shrimpton's misconduct could, under some circumstances, constitute gross misconduct under COBRA, Quest has failed to present evidence sufficient to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

The term "gross misconduct" is not defined under COBRA, and case law does

not provide a clear definition of the term.[5] *Nero v. Uni. Hosps. Mgmt. Servs. Org.*, No. 1:04-cv-1833, 2006 WL 2933957, at \*4 (N.D. Ohio Oct. 12, 2006) (Aldrich, J.); *Moore, 702 F. Supp. 2d at 24*.  Mere negligence or incompetence does not rise to the level of gross misconduct.  *See Mlsna v. Unitel Comm'ns*, 91 F.3d 876, 881 (7th Cir. 1996); *Moore*, 702 F. Supp. 2d at 24 (collecting cases).  Moreover, conduct that amounts to simple mistake or mere inattention to detail does not constitute gross misconduct.  *See Nero*, 2006 WL 2933957, at \*4.  Courts have defined gross misconduct under COBRA generally as outrageous, extreme, or unconscionable conduct.  *Moore*, 702 F. Supp. 2d at 24 (citing *Zickafoose v. UB Servs., Inc.*, 23 F. Supp. 2d 652, 654, 657 (S.D. W. Va. 1998)).  It includes misconduct that is intentional, wanton, willful, deliberate, or reckless; or that is performed with deliberate indifference to an employer's interests.  *Nero*, 2006 WL 2933957, at \*4 (quoting *Collins v. Aggreko, Inc.*, 884 F. Supp. 450, 454 (D. Utah 1995)); *Nakisa*, 2001 WL 1250267, at \*2; *see also Burke v. Am. Stores Emp. Benefit Plan*, 818 F. Supp. 1131, 1135 (N.D. Ill. 1993); *Adkins v. United Int'l Investigative Servs., Inc.*, No. C 91-0087 BAC, 1992 U.S. Dist. LEXIS 4719, at \*11 (N.D. Cal. Mar. 27, 1992).  It is misconduct beyond mere minor breaches of employee standards, but conduct that would be considered gross in nature.  *Collins*, 884 F. Supp. at 454.  In

---

[5]  The Public Health Services Act ("PHSA"), 42 U.S.C. §§ 300bb-1 *et seq.*, is analogous to COBRA and applies to state- and local-government-operated group health plans but it, too, is not instructive on the definition of "gross misconduct."  *Larsen v. Senate of Com. of Pa.*, 154 F.3d 82, 96 (3d Cir. 1998). Moreover, the parties have not introduced as evidence any document providing details of Quest's group health plan, including any provisions that might define the term "gross misconduct" or describe the circumstances under which an employee or other family member may be disqualified from receiving COBRA notification and continuation health care coverage.

sum, misconduct is gross misconduct under COBRA if it is so outrageous that it shocks

the conscience.  *Zickafoose*, 23 F. Supp. 2d at 655.

Plaintiff notes that, in all the cases where courts have found gross misconduct

under COBRA, the misconduct somehow related to or affected the employer's interests,

the employee's work, or the work environment.[6]  In *Zickafoose v. U.B. Servs., Inc.*, 23 F.

Supp. 2d 652 (S.D. W. Va. 1998), the court articulated this relationship as a "substantial

---

[6]  *See, e.g.*, *Moore*, 702 F. Supp. 2d at 22, 25 (assistant professor pleaded guilty
to student aid fraud, bank fraud, and Social Security fraud, and lied on his
employment application about having an undergraduate degree); *Nakisa*, 2001
WL 1250267, at *3 (flight attendant made a racial remark toward a co-worker
and threw an apple at her while aboard their airplane); *McKnight v. Sch. Dist. of
Philadelphia*, 171 F. Supp. 2d 446, 447, 456 (E.D. Pa. 2001) (school teacher
was charged with sexual assault against an eighteen-year-old male who was
the teacher's former student); *Bryant*, 100 F. Supp. 2d at 365 (employee
repeatedly and persistently refused to follow his supervisor's instructions);
*Zickafoose*, 23 F. Supp. 2d at 654, 657 (manager severely battered and
hospitalized his co-worker while the co-worker was visiting his home); *Collins*,
884 F. Supp. at 454 (employee drank a substantial amount of alcohol at a
business meeting, became intoxicated, and thereafter caused a car accident
while driving a company car); *Burke*, 818 F. Supp. at 1133, 1138 (employee
stole store coupons from her employer and redeemed them to obtain free
turkeys from her employer); *Adkins*, 1992 U.S. Dist. LEXIS 4719, at *11-12
(security guard abandoned his post and falsified his work log to obtain payment
for the time he was supposed to be on duty).

In the cases where courts have found that the employee's misconduct was *not*
gross misconduct under COBRA, the misconduct was attributed to mere
incompetence, mistake, or carelessness.  *See, e.g.*, *Nero*, 2006 WL 2933957,
at *4 (medical doctor's assistant absentmindedly filed laboratory test results
under the wrong patients' charts, mislabeled blood samples, and failed to follow
through with patient referrals and prescriptions); *Lloynd v. Hanover Foods
Corp.*, 72 F. Supp. 2d 469, 472-73, 479 (D. Del. 1999) (employee mistakenly
failed to add onion powder to several batches of ravioli); *Paris v. Korbel &
Bros., Inc.*, 751 F. Supp. 834, 838-39 (N.D. Cal. 1990) (employee disclosed to a
co-worker certain executives' conversations about how the co-worker's hours
might be reduced).

-11-

nexus" standard.  *Zickafoose*, 23 F. Supp. 2d at 656.

In *Zickafoose*, the employee was a manager who savagely assaulted his co-worker while the co-worker was visiting his home.  *Id.* at 654.  In determining whether the employee's misconduct constituted gross misconduct under COBRA, the court explained that "the proper inquiry should consider not only whether the employee intended to harm the employer but likewise whether the nature of the conduct itself is reasonably outrageous to the employer."  *Id.* at 656.  The court further explained that, "In the latter instance, the conduct or its effects must have a substantial nexus to the workplace."  *Id.*  In other words, "gross misconduct for purposes of COBRA includes non-work related outrageous behavior if there is a substantial nexus between the behavior and the working environment such that the effects of the intolerable behavior extend into the employment arena."  *Id.* at 657.

The court in *Zickafoose* then explained how the effects of the employee's misconduct extended into the working environment:

> If the assault had occurred between Plaintiff and a non-employee, Plaintiff might have a more compelling argument.  However, the co-worker was not a person unknown or unconnected to the workplace. Employees of Defendant corporations knew her and worked with her on a daily basis.  The employees also knew and worked with Plaintiff. For some employees, Plaintiff was their supervisor. Knowledge of a vicious assault by an employee might create a uncomfortable working environment under normal circumstances. However, the discomfort undoubtedly will be heightened when that employee is a manager or supervisor and the victim is a fellow employee. Such an assault not only produces fear and tension among co-workers, it casts serious doubt upon the manager's capacity for responsible decision making.  Hence, Plaintiff's role as a supervisor coupled with an assault on a co-worker provides a logical nexus between the gross misconduct and the workplace to justify the disallowance of Plaintiff's insurance benefit continuation under COBRA.

*Id.*

-12-

The Court finds *Zickafoose*, in light of the rest of the relevant case law, persuasive.[7]  The holding in *Zickafoose* also resonates with other federal statutory law such as the Federal Employees Health Benefits Amendments Act of 1988 ("FEHBAA"), which allows federal employees to continue their Federal Employee Health Benefits ("FEHB") coverage after they leave employment with the federal government.  5 U.S.C. § 8905a(a).  Under the FEHBAA, an employee involuntarily terminated from employment for "gross misconduct," as it is defined by the Office of Personnel Management ("OPM"), would not be eligible for continuation coverage.  § 8905a(b)(1)(A).  The OPM explains that, for misconduct to constitute gross misconduct under the FEHBAA, "There must be a nexus between the offense and the employee's job."  54 F.R. 52333, 52333 (Dec. 21, 1989).

Quest cites *Larsen v. Senate of Com. of Pa.*, 154 F.3d 82, 96 (3d Cir. 1998), to argue that COBRA should not be understood to require employee misconduct to relate to or otherwise affect the employee's employment to constitute gross misconduct under the statute.  In *Larsen*, the court declined to limit the meaning of the term "gross

---

[7] The court in *Zickafoose* relied on a handful of state court decisions regarding denial of state-provided unemployment benefits.  *Zickafoose*, 23 F. Supp. 2d at 656-57.  State law may be a useful starting point for ascertaining the meaning of federal law.  *See, e.g., Paris*, 751 F. Supp. at 838 (relying on California state courts' standard for determining the level of employee misconduct necessary to justify denial of state-provided unemployment insurance benefits) *and Burke*, 818 F. Supp. at 1135 (considering Illinois statutes describing when an employee is ineligible for state-provided unemployment benefits if discharged for misconduct).  In Ohio, an individual generally is not entitled to state-provided unemployment compensation benefits if she is discharged from her employment for "just cause *in connection with her work*."  Ohio Rev. Code § 4141.29(D)(2)(a) (emphasis added); *see Shephard v. Ohio Dep't of Job & Family Servs.*, 166 Ohio App. 3d 747, 753, 853 N.E.2d 335, 339 (8th Dist. 2006).

-13-

misconduct" under the Public Health Services Act ("PHSA") to misconduct that occurs within the scope of the employee's employment because "nothing in the statutory language or relevant case law clearly establishes, or even suggests, that 'gross misconduct' under the PHSA must occur within the scope of employment." *Larsen*, 154 F.3d at 96.  *See also Collins*, 884 F. Supp. at 454 (declining to interpret "gross misconduct" under COBRA to require misconduct to be intentional because Congress did not articulate an "intentional misconduct" standard in COBRA).  The Court finds *Larsen* distinguishable.  Here, the relevant case law and other federal statutes suggest that an employee's misconduct must somehow be related to or affect an employee's employment to constitute gross misconduct under COBRA, and such a requirement is not unreasonable.[8]

Quest argues in the alternative that Brian Shrimpton's misconduct sufficiently related to or affected his employment and, therefore, constituted gross misconduct under COBRA.  Quest explains that Brian's misconduct could fairly be characterized as "gross"; that Brian was in a position of heightened duty and responsibility as Manager of Quest's National Referral Testing department, which made his misconduct all the more egregious; that Brian's criminal conduct and consequent imprisonment effectively

---

[8] Quest cites other cases to support the proposition that an employee's misconduct does not have to somehow relate to or affect the employee's employment to constitute gross misconduct under COBRA: *Zickafoose*, 23 F. Supp. 2d at 652, *McKnight*, 171 F. Supp. 2d at 446, and *Ballin v. Metro. Transit Comm.*, 525 N.W.2d 11 (Minn. Ct. Ap.. 1994).  A review of these cases, however, indicates that the misconduct at issue in them *related to or affected* the employees' employment.  Indeed, in *Ballin*, a state court decision, the court recognized that the employee's misconduct must have "interfered with and substantially affected his employment" before he could properly be denied state-provided unemployment benefits.  *Ballin*, 525 N.W.2d at 12.

-14-

constituted an abandonment of his job and, therefore, constituted a substantial disregard for Quest's interests; and that knowledge of Brian's criminal activity and imprisonment might create an uncomfortable working environment at Quest.

The Court agrees that Brian's misconduct could be characterized as "gross." Moreover, the Court recognizes that Brian's misconduct could be lawful grounds for termination from employment.  The question here, however, is not whether Brian was rightfully terminated from employment, but whether his misconduct was of the kind that Congress intended would disqualify him and, more importantly, his family members, from receiving notice and continuation health care coverage under COBRA.[9]

Although Quest alleges that Brian was a manager at Quest, none of the pleadings indicate that Brian was a manager and Quest cites no evidence whatsoever to support this allegation.  Moreover, Quest does not explain any other aspects of Brian's job, including, but not limited to, Brian's job duties, where he worked, when he worked, and with whom he worked.

The only basis that Quest has sufficiently articulated in support of the conclusion that Brian Shrimpton's misconduct constituted gross misconduct under COBRA is that

---

[9]  Indeed, the purpose of COBRA is to prevent not just employees, but employees' spouses and dependent children from losing health care coverage under circumstances beyond their control.  *See* S. Rep. 99-146, at 363 ("The committee was concerned that certain spouses and dependent children may be deprived of health benefits due to an unexpected change in family status."); *Paris*, 751 F. Supp. at 837 (explaining that the employee's misconduct— divulging the contents of a private conversation among corporate executives to a co-worker that indicated the co-worker's hours would be cut—did not amount to gross misconduct under COBRA because such misconduct was not severe enough in light of the purpose of COBRA—"to protect and cushion a worker and her family in transition from job to job").

-15-

Brian failed to appear for and perform his work because he was incarcerated.  The Court is not prepared, however, to conclude that an employee's failure to appear at work, even if it is because of incarceration, is alone enough to constitute gross misconduct under COBRA.  Absent evidence of Brian's employment activities, responsibilities, and relationships, the Court is unable to conclude that Brian's misconduct sufficiently related to or affected his work to constitute gross misconduct under COBRA.

In sum, the factual question of whether Brian Shrimpton's conduct related to or affected his work is material to whether his conduct constituted gross misconduct under COBRA, is material to whether Patricia Shrimpton was disqualified from receiving COBRA notification from Quest, and remains unresolved.  Quest has failed to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Therefore, Quest's Motion for Summary Judgment should be denied.

**C.    Waiver**

Plaintiff argues that, even if Brian Shrimpton's misconduct constituted gross misconduct under COBRA, Quest waived its gross misconduct defense by acting as if Patricia Shrimpton had been entitled to receive COBRA notification after Brian was terminated.  Because the question of whether Quest waived its gross misconduct defense is raised as the basis for Plaintiffs' Motion for Summary Judgment, the facts and inferences relevant to this issue will be viewed in a light most favorable to Quest. For the reasons set forth below, the Court finds that Plaintiffs' argument lacks merit.

It is undisputed that, on November 9, 2009, Quest sent Patricia COBRA notification and forms by which Patricia could elect to continue coverage under Quest's

-16-

group health plan.  It is also undisputed that Patricia sent Quest a check on or around December 9, 2009, to pay for her health insurance premium under Quest's group health plan and thereby became covered under Quest's group health plan.  Plaintiffs note the following as further evidence that Quest waived its gross misconduct defense:  (1) Quest terminated Brian without any verbal or written allegation from Quest that it was terminating him for what it considered "gross misconduct"; (2) Quest employees told Brian they would be sending him COBRA paperwork; (3) Quest did not send Patricia COBRA eligibility notices until after she questioned the lack of notice and termination of her healthcare coverage; (4) Quest did not inform Plaintiff's or their Counsel that Brian's termination was for "gross misconduct," or that COBRA's gross misconduct exception disqualified Patricia from notice and coverage, until this lawsuit was initiated; and (5) Quest first asserted its gross misconduct defense in its Answer to Plaintiffs' Amended Complaint.[10]

The parties agree that waiver, as it is to be understood in this case, is the voluntary relinquishment of a known right.  *See In re McFarland*, 126 B.R. 885, 888 (Bankr. S.D. Ohio 1991); *State ex rel. Wallace v. State Med. Bd. of Ohio*, 89 Ohio St. 3d

---

[10] Plaintiffs also assert that, if Quest had denied Patricia's election for COBRA coverage, Quest would have been required to notify Patricia that she was not eligible for COBRA coverage and explain to her why she was not eligible, pursuant to 29 C.F.R. 2590.606-4(c).  Plaintiffs fail to explain, however, why this is relevant.  Moreover, 29 C.F.R. 2590.606-4(c) is not applicable here.  29 C.F.R. 2590.606-4(c) requires group health plan administrators to give notice to employees or qualified beneficiaries only *after* the employees or qualified beneficiaries give notice to the administrator that certain qualifying events have occurred, and termination from employment for reasons other than the employee's gross misconduct is not one of those qualifying events.  29 C.F.R. § 2590.606-3(a); 69 F.R. 30084-01, 30085 (May 26, 2004).

-17-

431, 435, 732 N.E.2d 960, 965 (2000).  Plaintiffs cite *Conery v. Bath Associates*, 803 F. Supp. 1388 (N.D. Ind. 1992), in support of their proposition that Quest's conduct constituted a waiver of Quest's gross misconduct defense.  The Court disagrees with Plaintiffs' interpretation of *Conery*.

In *Conery*, the former employee, Mr. Conery, was asked to leave his position as president, director, and shareholder of his employer, Bath, because of allegations that Mr. Conery had been misappropriating company funds for his personal use.  *Conery v. Bath Assocs.*, 803 F. Supp. 1388, 1393 (N.D. Ind. 1992).  Rather than firing Mr. Conery, Bath and Mr. Conery entered into a severance agreement whereby Mr. Conery would resign, surrender his interest in the company for a small fee, and refrain from professionally competing with Bath.  *Id.*  In return, Bath agreed to keep the circumstances of Mr. Conery's resignation confidential, and agreed to release Mr. Conery from any and all claims that Bath may have had against Mr. Conery at the time of they entered the severance agreement.  *Id.*  Mr. Conery and his dependent children subsequently sued Bath for failing to give them notice of their right to elect continuation coverage, and for failing to continue the their health care coverage, pursuant to COBRA.  *Id.* at 1392.

Bath contended that it had no duty to provide notice and continuation coverage to Mr. Conery and his beneficiaries because Mr. Conery had been terminated for conduct that constituted gross misconduct under COBRA—namely, embezzling company funds.  *Id.* at 1396.  The court, however, found that the severance agreement, as well as Bath's conduct after Mr. Conery's departure, indicated that Bath did not terminate Mr. Conery for his misconduct.  *Id.*

-18-

The court noted that the severance agreement made no mention of any misconduct on the part of Mr. Conery, provided no explanation for why Mr. Conery agreed to resign, and discharged Mr. Conery from any and all claims that Bath may have had against him.  *Id.*  Moreover, after Mr. Conrey discontinued his employment with Bath, Bath sent Mr. Conery two COBRA notices and accepted Mr. Conery's premium payments.  *Id.* at 1397.  Mr. Conery's coverage was denied by the insurance company only because of an administrative mistake that caused Mr. Conery's election to be late.  *Id.* at 1394.  Bath did not assert that it had intended to deny coverage to Mr. Conery and his beneficiaries because of Mr. Conery's misconduct until the lawsuit was initiated.  *Id.* at 1397.  The court concluded that, although Mr. Conery's misconduct may have precipitated his separation from Bath, Bath specifically agreed to allow Mr. Conery to resign rather than terminate him for his misconduct, and further agreed to provide Mr. Conery with COBRA coverage.  *Id.* at 1396.

In sum, *Conery* does not stand for any legal proposition regarding waiver. Rather, *Conery* stands for the proposition that, if the evidence before a court on summary judgment shows that there is no genuine dispute that an employer elected not to terminate an employee for misconduct, the employer will not prevail on the defense that it terminated the employee for gross misconduct under COBRA.  *Conery* is inapposite here.

Plaintiffs thus leave unexplained how Quest's actions after Brian Shrimpton's termination amounted to a voluntarily relinquishment of a known right to assert the gross misconduct defense.  Indeed, one can only speculate as to whether the circumstances to which Plaintiffs cite evince waiver.

Quest, on the other hand, offers the affidavit of Mr. Thomas B. Schlegel, Vice President of Human Resources for Quest's Physician Business, and alleges that the Quest employees who sent Patricia her COBRA notification were not aware that Brian's criminal conduct—the basis of his termination—constituted gross misconduct under COBRA and disqualified Patricia from the right to receive COBRA notification. (Schlegel Aff. ¶ 11.)  In other words, Quest alleges that it mistakenly sent Patricia her COBRA notification.  Plaintiffs reply that this allegation is self-serving and directly contradicts Brian's affidavit alleging that a Human Resources Manager told him that he could expect to receive COBRA notification.  (Brian Shrimpton Aff. ¶ 1.)  The affidavits, however, are not inconsistent as the Human Resources Manager could have mistakenly informed Brian that he could expect COBRA paperwork.

Viewing the facts and reasonable inferences drawn therefrom in a light favorable to the nonmovant on the issue of waiver, the Court finds that there is a genuine question of material fact regarding whether Quest knowingly relinquished its right to assert a gross misconduct defense in this litigation.  Therefore, Plaintiffs' Motion for Summary Judgment should be denied.[11]

---

[11] Quest argues in the alternative that, even if Plaintiffs' waiver argument had merit, it would only apply to the Quest's obligation to provide continuation coverage to Patricia, not to Quest's obligation to give notice to her.  In other words, Quest argues that the obligation to give notice and the obligation to provide continuation coverage are distinct and severable obligations as they arise under two separate and distinct provisions of COBRA, and that providing election forms and allowing Patricia to elect continuation coverage would be a waiver only of Quest's right to argue that Patricia was not entitled to *coverage*. Quest contends that it would retain the right to argue Patricia was not entitled to notice.  The Court need not address this argument as it finds that Plaintiffs' waiver argument lacks merit.

### III.    CONCLUSION

For the reasons set forth above, the Magistrate Judge recommends that Quest's Motion for Summary Judgment be DENIED, and that Plaintiffs' Motion for Summary Judgment be DENIED.


                                              s/ *Nancy A. Vecchiarelli*
                                              Nancy A. Vecchiarelli
                                              U.S. Magistrate Judge


Date: January 24, 2011



### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**